# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>                Respondent,<br><br>             v.<br><br>KENNETH PAUL ZIMMERMAN,<br><br>                Appellant. | DIVISION ONE<br><br>No. 81032-4-I<br><br>UNPUBLISHED OPINION |

DWYER, J. — Kenneth Zimmerman appeals from the judgment entered on a jury's verdict finding him guilty of attempted rape of a child in the second degree and four counts of communication with a minor for immoral purposes. On appeal, Zimmerman contends that the evidence presented at trial was insufficient to support any of his convictions. Additionally, he asserts that the trial court erred by incorrectly instructing the jury, improperly rejecting several of his proposed jury instructions, and impermissibly preventing him from calling two witnesses. Lastly, Zimmerman contends that the prosecutor engaged in misconduct during closing argument. Because Zimmerman does not establish an entitlement to relief on any of his claims, we affirm.

I

In December 2015, Zimmerman was arrested as the result of an undercover operation initiated by the Washington State Patrol Missing and Exploited Children Task Force. As part of this operation, Detective Jeff Bickford posed as a 13-year-old girl named "Kaylee" and responded to ads on Craigslist. Detective Bickford's purpose was to "identify persons that were interested in engaging in sexual activity with children."

Detective Bickford found an ad posted by Zimmerman, entitled "looking for young little girl – m4w."[1] The ad stated:

> Hello, I am looking for a young little girl for play. Looking for open minded and obedient. Looking to pleased abs be pleased. Please tell me about you and include a picture. Looking for kinky fun. Put your favorite color in the subject line.

On December 14, 2015, Detective Bickford responded to Zimmerman's ad via e-mail, writing, "im totally bored…what kinda play r u into?" Zimmerman responded, "Hello, I am b very open in play. I am a Dom. I like bdsm, dirty talk, pda and whatever you like. My name is Ken. Hit me up let's text a little and go from there." Zimmerman then provided his telephone number. Detective Bickford replied, "i don't no what ur talking about…im almost 14 but act way older…I nvr herd of that stuff though." In response, Zimmerman asked for pictures, and Detective Bickford sent him an age-regressed photo of a female detective and a telephone number to text. Zimmerman responded, "Pretty picture, where are you from you said you just moved here? You should be in

---

[1] "m4w" means "man for woman."

school what school do you go to? It was very important question are you affiliated in any way with law enforcement?" Detective Bickford replied, "i don't go to skoool here yet... what does affiliat mean?"

After a few more e-mails, Zimmerman started texting Detective Bickford and, over the course of three days, the two exchanged 364 text messages. On December 15, 2015, Zimmerman (1) asked for pictures of "Kaylee" multiple times; (2) asked whether she had ever had sex; (3) asked why she was interested in someone older; (4) asked whether she wanted to meet up either that day or the following day; (5) asked about her mom and dad; and (6) inquired into why "a pretty girl like [her] doesn't have any boyfriends."

On December 16, 2015, Zimmerman (1) asked for a "sexy pic" of "Kaylee" and that she "show [her] tits"; (2) asked for "sexy pictures" with her "shirt off"; (3) expressed that he wanted to see "Kaylee" the following day; (4) stated that she would be "a little young to be [his] date" to a Christmas function; (5) asked about "Kaylee's" weight and size; (6) asked whether "Kaylee" had "ever put [her] mouth on a cock before" and "how many"; and (7) stated that he could "come over tomorrow around 6."

On December 17, 2015, Zimmerman (1) asked whether "Kaylee's" dad was home; (2) inquired into what she was "going to wear for [him]"; (3) asked whether "Kaylee" "shave[d] down in [her] vagina area"; (4) suggested that sex with him may hurt because she is "not use to it"; (5) asked whether "Kaylee" "use[d] a vibrator or fingers on [her]self"; and (6) stated that he was "fixed" and "disease free" and, therefore, did not need a condom.

That same day, Zimmerman also asked "Kaylee" for her address. Detective Bickford responded, stating that "Kaylee" lived "in a hill by the hospital" and by "the chickn plce call[ed] . . . ezls" near "the hospital." At 7:10 p.m., Zimmerman texted "Kaylee" that he was about 15 minutes away from her location. Zimmerman drove from a Fred Meyer store near Cheney Stadium to the Hilltop neighborhood of Tacoma where Saint Joseph's Medical Center is located.

At 7:33 p.m., Zimmerman texted that he was "already up by the hospital." Over the next hour, Zimmerman described his activity as he was searching for "Kaylee's" house. He texted that a guy stopped him "wanting to know what [he] was doing in [the] neighborhood," that he had "been hanging out down here for an hour [and] people ha[d] seen [his] car," that "[t]here [were] black guys all over the place [and] cars around here circling," and that "[t]hey've seen [him] several times and stop [him]." Detective Bickford texted Zimmerman the address for a trap house, which was a house associated with the undercover police operation and located by Saint Joseph's Medical Center.

At 8:31 p.m., Zimmerman asked "Kaylee" to "walk up to the emergency entrance to the hospital parking lot and . . . meet [him] there" because he "[felt] safer doing that." Around 8:30 p.m., police observed Zimmerman's car in the emergency room parking lot of St. Joseph's Medical Center. Zimmerman then drove past the trap house and appeared to be leaving the area. At 8:38 p.m., police arrested Zimmerman.

- 4 -

Pursuant to a search warrant for Zimmerman's cell phone, the police found e-mails and text messages sent to "Kaylee," the photographs sent by Detective Bickford, Internet searches to the Craigslist ad, "looking for young little girl – m4w," and Internet searches for the location of Ezell's Chicken and the address of the trap house.

The State charged Zimmerman with one count of attempted rape of a child in the second degree and four counts of communication with a minor for immoral purposes. At trial, Zimmerman testified that he created the Craigslist ad and sent the e-mails and text messages that were admitted into evidence. He also testified that he drove to the area surrounding Saint Joseph's Medical Center and had no reason to be in that area except to meet "Kaylee." However, Zimmerman denied ever believing that "Kaylee" was a minor and further stated that he never intended to meet or have sexual intercourse with the person he was texting.

The jury found Zimmerman guilty of all offenses charged. Zimmerman filed a motion for arrest of judgment and new trial, which the trial court denied. The trial court sentenced Zimmerman to an indeterminate sentence of 180 months to life for attempted rape of a child in the second degree and two determinate sentences of 29 and 60 months for four counts of communication with a minor for immoral purposes,[2] with all sentences to run concurrently. Zimmerman appeals.

---

[2] At sentencing, the trial court found that the evidentiary basis for Counts III and IV involved the "same criminal conduct" as Count II. Thus, only two sentences were imposed on the four counts.

II

Zimmerman first contends that the evidence is insufficient to support the jury's guilty verdict on the charge of attempted rape of a child in the second degree. Because a rational trier of fact could have found that he both intended to have sexual intercourse with a 13-year-old and took a substantial step toward doing so, we disagree.

A

When reviewing the sufficiency of the evidence to sustain a conviction, we view the evidence in the light most favorable to the State, draw all reasonable inferences from the evidence in the State's favor, and interpret the evidence most strongly against the defendant. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). A claim of insufficiency admits the truth both of the State's evidence and all reasonable inferences from the evidence. Salinas, 119 Wn.2d at 201. The question on appeal is whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979).

B

Rape of a child in the second degree occurs

> when [a] person has sexual intercourse with another who is at least twelve years old but less than fourteen years old and not married to the perpetrator and the perpetrator is at least thirty-six months older than the victim.

RCW 9A.44.076(1).

To attempt a crime, the defendant must have the intent to commit a specific crime and take a substantial step toward the commission of that crime.

RCW 9A.28.020(1). "The intent required is the intent to accomplish the criminal result of the base crime." State v. Johnson, 173 Wn.2d 895, 899, 270 P.3d 591 (2012).

Conduct constitutes a substantial step toward the commission of a crime if it "is 'strongly corroborative of the actor's criminal purpose.'" State v. Townsend, 147 Wn.2d 666, 679, 57 P.3d 255 (2002) (quoting State v. Aumick, 126 Wn.2d 422, 427, 894 P.2d 1325 (1995)). Also, "any act done in furtherance of the crime constitutes an attempt if it clearly shows the design of the defendant to commit the crime." State v. Wilson, 158 Wn. App. 305, 317, 242 P.3d 19 (2010). However, "[m]ere preparation to commit a crime is not a substantial step." Townsend, 147 Wn.2d at 679. Similarly, a defendant's words, "without more," are insufficient "to constitute the requisite overt act." State v. Grundy, 76 Wn. App. 335, 337, 886 P.2d 208 (1994).

In State v. Wilson, we held that the following conduct was sufficient to establish both the requisite intent for attempted rape of a child in the second degree and a substantial step toward the commission of that crime: Wilson arranged via e-mail to have "oral and full sex" with a fictitious 13-year-old girl for $300, went to the agreed upon meeting place while in possession of $300, waited in his car for approximately 30 minutes, and admitted that he intended to have sex with a 13-year-old. 158 Wn. App. at 317-18.

Similarly, in State v. Sivins, 138 Wn. App. 52, 64, 155 P.3d 982 (2007), Division Three held that the following communications provided sufficient evidence of the intent required for attempted rape of a child in the second

degree: Sivins sent sexually graphic Internet communications to someone he believed to be a 13-year-old girl, stated that he would have sex with her if she wanted, and enticed her with promises of vodka and pizza. Additionally, the court held that the acts of driving five hours to Pullman and securing a motel room for two people were each "substantial steps that strongly corroborate[d] [Sivins's] intention to have sexual intercourse with [a 13-year-old]." Sivins, 138 Wn. App. at 64.

Here, there is sufficient evidence that Zimmerman intended to have sexual intercourse with a 13-year-old. Like the defendant in Sivins, who sent sexually graphic Internet communications to someone he believed to be a 13-year-old girl, Zimmerman sent sexually graphic text messages to a fictitious 13-year-old girl. For example, Zimmerman texted "Kaylee," "So have you ever been with a guy before have you ever had sex before," "I wish you send a sexy pic of you," "Show your tits," and "have you ever put your mouth on a cock before." In addition to these text messages, Zimmerman posted the ad on Craigslist, which stated, "I am looking for a young little girl for play" and "Looking for kinky fun."

Indeed, just as the defendant in Sivins told a fictitious 13-year-old girl that he would have sex with her if she wanted, Zimmerman's text messages to "Kaylee" demonstrate that he planned to meet her to have sexual intercourse. In particular, Zimmerman texted "Kaylee," "Maybe we could meet up tomorrow or Thursday" and Detective Bickford responded, "u culd totally com ovr i guess... u seem cool." The following day, Zimmerman texted, "I can come over tomorrow

around 6," and "Kaylee" then described her house and the "chickn plce" nearby. And the next day, Zimmerman requested directions to "Kaylee's" house while he was in the area, asked that she meet him at the hospital while he was in the Saint Joseph's Medical Center parking lot, and admitted that he had no reason to be in the area except to meet "Kaylee." A rational trier of fact could conclude that these text messages—along with the Craigslist ad— reveal Zimmerman's intent to have sexual intercourse with a person whom he believed to be a 13-year-old girl.

There is also sufficient evidence that Zimmerman took a substantial step toward the commission of rape of a child in the second degree. Zimmerman drove from a Fred Meyer store near Cheney Stadium to the Hilltop neighborhood of Tacoma with no reason to be in that area except to meet "Kaylee." Additionally, Zimmerman remained in the area of what he believed to be "Kaylee's" home for nearly an hour. While he was in the area, Zimmerman texted that he was "kinda spooked" by a guy that "stop[ped] [him] wanting to know what [he] was doing in [the] neighborhood." Zimmerman subsequently informed "Kaylee" that he went to "the hospital where . . . its safe" because "[t]here are black guys all over the place in here cars around . . . circling." Zimmerman then texted "Kaylee," "Why don't you walk up to the emergency entrance to the hospital parking lot and I can meet you there I feel safer doing that." Around this time, police observed Zimmerman's car in the emergency room parking lot of St. Joseph's Medical Center.

Thus, as with the defendant in <u>Wilson</u>, who drove to an arranged parking lot and waited in the car for 30 minutes, Zimmerman drove from a Fred Meyer store near Cheney Stadium to the area of what he believed to be "Kaylee's" home with no reason to be there except to meet "Kaylee," remained in the area for nearly an hour, and asked "Kaylee" to meet him at the hospital. A rational trier of fact could conclude that Zimmerman drove to what he believed to be the area of "Kaylee's" home and asked her to meet him at the hospital in order to facilitate sexual intercourse. Therefore, proof of these acts is sufficient to constitute a substantial step toward the commission of rape of a child in the second degree. <u>See</u> <u>Townsend</u>, 147 Wn.2d at 679 (stating that conduct constitutes a substantial step toward the commission of a crime if it "is 'strongly corroborative of the actor's criminal purpose.'" (quoting <u>Aumick</u>, 126 Wn.2d at 427)).

Accordingly, sufficient evidence supports the jury verdict on the charge of attempted rape of a child in the second degree.

III

Zimmerman also contends that the evidence is insufficient to support his convictions for Counts II through V of communication with a minor for immoral purposes. We disagree.

A

The crime of communication with a minor for immoral purposes occurs when

- 10 -

> a person . . . communicates with a minor for immoral purposes, or a person . . . communicates with someone the person believes to be a minor for immoral purposes.

RCW 9.68A.090(1).

The term "immoral purposes" is not defined by statute. See RCW 9.68A.011. However, our Supreme Court has explained that "the statute prohibits communication with children for the predatory purpose of promoting their exposure to and involvement in sexual misconduct." State v. McNallie, 120 Wn.2d 925, 933, 846 P.2d 1358 (1993).

B

As charged in the information, Count II concerned Zimmerman's communications with Detective Bickford, posing as "Kaylee," "during the period including the 14th and 16th days of December, 2015." Further, the information specifies that Count II regarded the "sending of an electronic communication, to wit: e-mail messages."

Considered in the context of the Craigslist ad, which had described Zimmerman as "[l]ooking for kinky fun," and "looking for a young little girl for play," the following e-mails exchanged between December 14 and 16 provide a sufficient evidentiary basis for Count II: (1) Prior to "Kaylee" providing her age, Zimmerman stated, "I am . . . very open in play[,] I am a Dom, [and] I like bdsm, dirty talk, pda and whatever you like"; (2) Detective Bickford then sent Zimmerman an e-mail stating, "i don't know what ur talking about…im almost 14 but act way older…I nvr heard of that stuff though"; (3) Zimmerman subsequently asked for pictures of "Kaylee" three times; and (4) Zimmerman, upon receipt of

an age-regressed picture of a female detective, said, "Pretty picture, where are you from you said you just moved here?  You should be in school what school do you go to?  It was very important question are you affiliated in any way with law enforcement?"

These messages provide sufficient evidence that Zimmerman was communicating with someone he believed to be a minor for immoral purposes of a sexual nature.[3]  The message by "Kaylee" stating her age suggests that Zimmerman believed he was communicating with a 13-year-old girl.  Further, in context, Zimmerman's requests for pictures of "Kaylee" could lead a rational trier of fact to believe that Zimmerman was asking for nude or semi-nude photographs.  After all, this e-mail exchange took place in response to Zimmerman's Craigslist ad "looking for a young little girl for play" and "for kinky fun," and, prior to asking for pictures, Zimmerman expressed his sexual preferences as "a Dom" who "like[s] bdsm, dirty talk, [and] pda."  Lastly, Zimmerman's statement that "Kaylee's" picture was "pretty" and his inquiry into whether she was "affiliated in any way with law enforcement" could lead a rational trier of fact to believe that Zimmerman was continuing his conversation with "Kaylee" for an immoral purpose and was aware of the peril of doing so.

---

[3] We do not hold that the jury could not consider evidence beyond that which we analyze in resolving the evidentiary dispute as to each count.  Rather, applying the Jackson standard, we hold that a rational trier of fact could conclude, in light of the evidence that we describe concerning each count, that Zimmerman communicated with a minor for immoral purposes.

Zimmerman's reference to law enforcement manifested a consciousness of guilt that is probative of his intent and motivation.[4]

Accordingly, sufficient evidence supports Zimmerman's conviction on Count II, communication with a minor for immoral purposes.

C

Count III concerned Zimmerman's text messages on December 15, 2015. The following text messages provide a sufficient evidentiary basis for Count III: (1) Zimmerman asked for pictures of "Kaylee" multiple times; (2) Zimmerman asked whether "Kaylee" had ever had sex; (3) Zimmerman asked why she was

---

[4] For instance, in State v. Wilson, the defendant asked an undercover police officer, in response to a Craigslist ad offering sex with a woman and her fictitious 13-year-old daughter, "This isn't some sort of Dateline thing is it?" 158 Wn. App. at 309. We noted this fear of being discovered in declaring the evidence adduced sufficient to support his conviction for attempted rape of a child in the second degree. Wilson, 158 Wn. App. at 320.

Likewise, in United States v. Farley, 607 F.3d 1294, 1334 (11th Cir. 2010), a federal appellate court held that a defendant's intent to engage in sexual acts with a person under the age of 12 was revealed, in part, by his "repeatedly acknowledg[ing] his awareness that what he planned to do was highly illegal." In particular, the defendant "suspected out loud to [an undercover officer] on seven different occasions [that he worried that he may be walking into] a sting operation." Farley, 607 F.3d at 1306. For example, the defendant "expressed some concern that [the undercover officer] might be 'a cop trying to entrap [him],'" "asked [the undercover officer] to get a webcam so he could . . . make sure that she was 'real and not some cop or something,'" and requested the undercover officer to "'please assure me that I am not walking into some kind of Dateline type set up [and to] [r]epeat after me: I am not a cop, I am not setting you up, I am not working under the authority of any police authority.'" Farley, 607 F.3d at 1301-05. All of this, the court reasoned, was evidence of his consciousness of guilt and, thus, proof of his intent.

Similarly, the Pennsylvania Supreme Court held that a defendant's intent to commit a crime may be demonstrated by evidence of the defendant asking whether a purported accomplice is affiliated with law enforcement. Commonwealth v. Murphy, 577 Pa. 275, 293, 844 A.2d 1228 (2004) (holding that a "jury could have found that [an accomplice] intended to aid [the principal] in delivering the drugs based [partly] on his act[] of questioning [an undercover officer] to determine if he was a police officer"). And Washington courts have long recognized the admissibility of evidence bearing on a defendant's consciousness of guilt. See e.g., State v. Bruton, 66 Wn.2d 111, 112, 401 P.2d 340 (1965) (stating that "[i]t is an accepted rule that evidence of the flight of a person" is admissible to demonstrate "consciousness of guilt"); State v. DeJesus, 7 Wn. App. 2d 849, 882, 436 P.3d 834, review denied, 193 Wn.2d 1024 (2019) (holding that evidence of a defendant filing a false police report to implicate someone else in a crime was properly admitted to show consciousness of guilt); State v. Freeburg, 105 Wn. App. 492, 497-98, 20 P.3d 984 (2001) ("[E]vidence of resistance to arrest, concealment, assumption of a false name, and related conduct are admissible if they allow a reasonable inference of consciousness of guilt of the charged crime.").

interested in someone older; (4) Zimmerman asked whether she wanted to meet up either that day or the following day; (5) Zimmerman asked about "Kaylee's" mom and dad; and (6) Zimmerman inquired into why "a pretty girl like [her] doesn't have any boyfriends."

Considered in the context of the Craigslist ad, a rational trier of fact could infer from these text messages that Zimmerman communicated with "Kaylee" for an immoral purpose of a sexual nature. Zimmerman inquired into "Kaylee's" sexual history, expressed that he was attracted to her, asked for pictures of her, and asked whether she wanted to meet. Therefore, sufficient evidence supports Zimmerman's conviction for Count III, communication with a minor for immoral purposes.

D

Count IV concerned Zimmerman's text messages on December 16, 2015. The following text messages provide a sufficient evidentiary basis for Count IV: (1) Zimmerman asked for a "sexy pic" of "Kaylee" and that she "show [her] tits"; (2) Zimmerman asked for "sexy pictures" with her "shirt off"; (3) Zimmerman expressed that he wanted to see "Kaylee" the following day; (4) Zimmerman stated that "Kaylee" would be "a little young to be [his] date" to a Christmas function; (5) Zimmerman asked about "Kaylee's" weight and size; (6) Zimmerman asked whether "Kaylee" had "ever put [her] mouth on a cock before" and "how many"; and (7) Zimmerman stated that he could "come over tomorrow around 6."

These messages show Zimmerman asking for nude pictures of "Kaylee," expressing that she was too young for them to be seen together in public,

inquiring into whether she had performed oral sex, and offering to drive to her house the next day. From this, a rational trier of fact could infer that Zimmerman was communicating with someone he believed to be a minor for immoral purposes of a sexual nature. Accordingly, Zimmerman's conviction on Count IV is supported by sufficient evidence.

E

Count V concerned Zimmerman's text messages on December 17, 2015. The following texts provide a sufficient evidentiary basis for Count V: (1) Zimmerman asked whether "Kaylee's" dad was home; (2) Zimmerman asked for her address; (3) Zimmerman suggested that they could meet at Ezell's Chicken; (4) Zimmerman inquired into what "Kaylee" was "going to wear for [him]"; (5) Zimmerman asked whether "Kaylee" "shave[d] down in [her] vagina area"; (6) Zimmerman suggested that sex with him may hurt because she is "not use to it"; (7) Zimmerman asked whether "Kaylee" "use[d] a vibrator or fingers on [her]self"; (8) Zimmerman stated that he was "fixed" and "disease free" and, therefore, did not need a condom; and (9) Zimmerman asked "Kaylee" to "walk up to the emergency entrance to the hospital parking lot and . . . meet [him] there" because he "[felt] safer doing that."

These messages reveal Zimmerman inquiring into how "Kaylee" masturbated, questioning "Kaylee" about her vagina, explaining why he does not need to use a condom when they have sex, requesting "Kaylee's" address, and asking for her to meet him at the hospital. From this, a rational trier of fact could conclude that Zimmerman communicated with someone that he believed to be a

minor for immoral purposes of a sexual nature. Thus, Zimmerman's conviction on Count V is supported by sufficient evidence.

IV

Zimmerman next contends that the trial court incorrectly instructed the jury on attempted rape of a child in the second degree and communication with a minor for immoral purposes. Additionally, he asserts that the trial court improperly rejected his proposed jury instructions on attempted rape of a child in the second degree, communication with a minor for immoral purposes, and entrapment. We disagree.

A

Zimmerman asserts that the trial court did not properly instruct the jury on the intent required for attempted rape of a child in the second degree. Specifically, he contends that the phrase "with intent to commit that crime" in jury instruction 6 impermissibly allowed the jury to speculate on what crime that might be. Zimmerman is wrong.

Jury instructions are sufficient if they permit each party to argue his or her theory of the case, are not misleading, and, when read as a whole, properly inform the jury of the applicable law. State v. Aver, 109 Wn.2d 303, 309, 745 P.2d 479 (1987). On appeal, "individual jury instructions [are read] 'in the context of the instructions as a whole.'" State v. Tyler, 191 Wn.2d 205, 216, 422 P.3d 436 (2018) (internal quotation marks omitted) (quoting State v. Williams, 162 Wn.2d 177, 182, 170 P.3d 30 (2007)).

The trial court's jury instruction 6 stated:

A person commits the crime of Attempted Rape of a Child in the Second Degree when, with intent to commit that crime, he does any act which is a substantial step toward the commission of that crime.[5]

Next, the trial court's jury instruction 7 stated:

A person acts with intent or intentionally when acting with the objective or purpose to accomplish a result that constitutes a crime.

Additionally, the trial court's jury instruction 8 stated:

A person commits the crime of Rape of a Child in the Second Degree when that person has sexual intercourse with child [sic] who is at least twelve years old but less than fourteen years old and who is not married to the person and is not in a state registered domestic partnership with the person and who is at least thirty-six months younger than the person.[6]

Finally, the trial court's jury instruction 12 stated:

To convict the defendant of the crime of Attempted Rape of a Child in the Second Degree as charged in Count I, each of the following elements of the crime must be proved beyond a reasonable doubt:
(1) That during the period including the 14th and the 17th days of December, 2015, the defendant did an act that was a substantial step toward the commission of Rape of a Child in the Second Degree;
(2) That the act was done with the intent to commit Rape of a Child in the Second Degree; and

---

[5] This language follows the Washington Pattern Jury Instruction applicable to all attempt crimes:
A person commits the crime of attempted (fill in crime) when, with intent to commit that crime, he or she does any act that is a substantial step toward the commission of that crime.
11A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 100.01 (4th ed.) (WPIC).

[6] The language used in jury instruction 8 closely resembles the language in the Washington Pattern Jury Instruction for attempted rape of a child in the second degree. The only difference is that the trial court added the language, "and is not in a state registered domestic partnership with the person," which Zimmerman does not contest:
A person commits the crime of rape of a child in the second degree when the person has sexual intercourse with a child who is at least twelve years old but less than fourteen years old, who is not married to the person, and who is at least thirty-six months younger than the person.
11 WPIC 44.12.

(3) That the act occurred in the State of Washington.

If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.

On the other hand, if, after weighing all the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.[7]

There are two reasons why the trial court's instruction on attempted rape of a child in the second degree was proper. First, jury instruction 12, standing alone, clearly indicates the proper intent required for attempted rape of a child in the second degree:

To convict the defendant of the crime of Attempted Rape of a Child in the Second Degree as charged in Count I, each of the following elements of the crime must be proved beyond a reasonable doubt:

(1) That . . . the defendant did an act that was a substantial step toward the commission of Rape of a Child in the Second Degree;

(2) That the act was done with the intent to commit Rape of a Child in the Second Degree.

This instruction plainly states that the intent required for attempted rape of a child in the second degree is the intent to commit the base crime, rape of a child in the second degree.

---

[7] Jury instruction 12 also mirrors the Washington Pattern Jury Instruction:

To convict the defendant of the crime of attempted (fill in crime), each of the following elements of the crime must be proved beyond a reasonable doubt:

(1) That on or about [date], the defendant did an act that was a substantial step toward the commission of (fill in crime);

(2) That the act was done with the intent to commit (fill in crime); and

(3) That the act occurred in the State of Washington.

If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.

On the other hand, if, after weighing all the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

11A WPIC 100.02.

Second, jury instruction 6 is proper when read in the context of the instructions as a whole. See Tyler, 191 Wn.2d at 216 ("[I]ndividual jury instructions [are read] 'in the context of the instructions as a whole.'" (internal quotation marks omitted) (quoting Williams, 162 Wn.2d at 182)). In particular, the term "that crime" in jury instruction 6 refers to rape of a child in the second degree as set out in jury instruction 8. Indeed, jury instruction 6 mirrors the language used in WPIC 100.01, which "may be used whenever an attempt to commit a crime is in issue." 11A WPIC 100.01, note on use. Nevertheless, any potential confusion concerning the meaning of "that crime" in jury instruction 6 was clarified by reference to jury instruction 12, which, as explained above, plainly states the appropriate intent for attempted rape of a child in the second degree.

For these reasons, Zimmerman's assignment of error fails.

B

Zimmerman next asserts that the trial court erred by not adopting his proposed jury instructions on attempted rape of a child in the second degree.

A trial court's refusal to give an instruction based on a ruling of law is reviewed de novo. State v. Walker, 136 Wn.2d 767, 772, 966 P.2d 883 (1998).

Zimmerman's proposed instructions stated:

> A person commits the crime of attempted rape of a child in the second degree when, *with intent to have sexual intercourse*, he or she does any act that is a substantial step toward the commission of that crime.
> The *intent required* for attempted rape of a child is the intent to accomplish the criminal result: *to have sexual intercourse*.

(Emphases added.)

- 19 -

These proposed instructions do not accurately state the law. While attempted rape of a child in the second degree requires a goal of sexual intercourse, it requires "sexual intercourse with another who is at least twelve years old but less than fourteen years old and not married to the perpetrator and the perpetrator is at least thirty-six months older than the victim." RCW 9A.44.076(1). Put differently, Zimmerman's proposed instruction is overbroad regarding the nature of the sexual intercourse that must be intended. A trial court is never required to issue a jury instruction that misstates the law. State v. Summers, 107 Wn. App. 373, 387, 28 P.3d 780, 43 P.3d 526 (2001). Thus, the trial court properly rejected this proposed instruction.

C

Zimmerman further asserts that the trial court's jury instruction 14, which defined communication with a minor for immoral purposes, provided no guidance as to what statements meet the definition of "immoral purposes" and what statements are protected speech.

Jury instruction 14 stated:

> A person commits the crime of Communication with a Minor for Immoral Purposes when he communicates with someone he believes to be a minor for immoral purposes of a sexual nature.
>
> Communication may be by words or conduct.

Our Supreme Court has upheld a jury instruction for communication with a minor for immoral purposes that defined "immoral purposes" as "immoral purposes of a sexual nature." McNallie, 120 Wn.2d at 933. The court reasoned that the term "immoral purposes" was not unconstitutionally vague. McNallie,

- 20 -

120 Wn.2d at 931-32 (citing State v. Schimmelpfennig, 92 Wn.2d 95, 102, 594 P.2d 442 (1979)).

Jury instruction 14 uses the very language approved of by the Supreme Court. Therefore, the trial court's challenged instruction was proper.

D

Zimmerman also asserts, without providing any support, that the trial court erred by not giving his proposed jury instruction defining "immoral purposes" as "unlawful sexual conduct." Indeed, Division Two has held that the crime of communication with a minor for immoral purposes was not intended to "proscribe communications about sexual conduct that would be legal if performed." State v. Luther, 65 Wn. App. 424, 426, 830 P.2d 674 (1992). However, this holding was made in the context of two 16-year-old persons who communicated about sexual conduct that would have been legal if performed. Luther, 65 Wn. App. at 425-26. It has no applicability to this matter.

At trial, Zimmerman did not contend that his conduct would have been legal if performed. Rather, Zimmerman asserted that "immoral purposes" should be defined as "unlawful sexual conduct" because his messages to "Kaylee" could be interpreted as protected speech. The trial court denied Zimmerman's proposed instruction, reasoning that, if there were affirmative evidence that Zimmerman thought he was communicating with a 17-year-old, then the proposed instruction might have been appropriate under Luther.

Because Zimmerman did not present evidence that any of the sex acts discussed in his communications with "Kaylee" would have been legal if

performed, the trial court did not err by rejecting Zimmerman's proposed instruction.

E

Zimmerman additionally asserts that the trial court erred by refusing to instruct the jury on the defense of entrapment to the charges of communication with a minor for immoral purposes.

A trial court's refusal to instruct a jury, if based on a factual dispute, is reviewed for abuse of discretion. Walker, 136 Wn.2d at 771-72. An abuse of discretion exists when a trial court's exercise of discretion is manifestly unreasonable or based on untenable grounds or reasons. State v. Powell, 126 Wn.2d 244, 258, 893 P.2d 615 (1995). If there is evidence to support a defense theory, a defendant is entitled to have the jury instructed on that theory. State v. Harvill, 169 Wn.2d 254, 259, 234 P.3d 1166 (2010).

To be entitled to an entrapment instruction, "a defendant must present evidence which would be sufficient to permit a reasonable juror to conclude that the defendant has established the defense of entrapment by a preponderance of the evidence." State v. Trujillo, 75 Wn. App. 913, 917, 883 P.2d 329 (1994). Moreover, defendants are entitled to an entrapment instruction when they "admit acts which, if proved, would constitute [a] crime." State v. Galisia, 63 Wn. App. 833, 837, 822 P.2d 303 (1992), abrogated on other grounds by Trujillo, 75 Wn. App. 913.

The statute establishing entrapment as a defense provides:

(1) In any prosecution for a crime, it is a defense that:

- 22 -

(a) The criminal design originated in the mind of law enforcement officials, or any person acting under their direction, and

(b) The actor was lured or induced to commit a crime which the actor had not otherwise intended to commit.

(2) The defense of entrapment is not established by a showing only that law enforcement officials merely afforded the actor an opportunity to commit a crime.

RCW 9A.16.070.

There are two reasons why the trial court did not err by declining to issue Zimmerman's proposed entrapment instruction. First, Zimmerman did not admit to acts that would constitute a crime. Instead, Zimmerman denied that he believed he was communicating with a minor and stated that he never intended to meet or have sex with the person he was texting and e-mailing. See RCW 9.68A.090(1) (stating that communicating with a minor for immoral purposes occurs when "a person . . . communicates with someone the person believes to be a minor for immoral purposes").

Second, the trial court reasonably determined that the evidence supported a finding that the criminal design did not originate in the minds of law enforcement officials. Zimmerman created the Craigslist ad that stated, "I am looking for a young little girl for play," and initiated sexual conversations, such as "I wish you send a sexy pic of you," "Show your tits," and "have you ever put your mouth on a cock before." From this evidence, the court reasonably concluded that a defense of entrapment was never properly put at issue. See Trujillo, 75 Wn. App. at 919 (affirming a trial court's refusal to instruct a jury on the defense of entrapment because there was insufficient evidence to support the defense).

Accordingly, the trial court did not err by rejecting Zimmerman's proposed entrapment instruction.

V

Zimmerman contends that the trial court violated his Sixth Amendment right to present a defense by refusing to let him call both Detective Sergeant Carlos Rodriguez and Michael Comte, a sexual offender expert, as witnesses.[8] We disagree.

A

A claim of a denial of Sixth Amendment rights is reviewed de novo. State v. Jones, 168 Wn.2d 713, 719, 230 P.3d 576 (2010). However, defendants have no constitutional right to present irrelevant evidence. Jones, 168 Wn.2d at 720. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. Additionally, even relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." ER 403.

---

[8] Zimmerman also asserts that the trial court erred by denying him access to the Internet Crimes Against Children "sting operation" training materials. However, Zimmerman's opening brief does not cite to any authority that would allow for meaningful review. The Rules of Appellate Procedure require "[t]he brief of the appellant . . . [to] contain . . . [t]he argument in support of the issues presented for review, together with citations to legal authority and references to relevant parts of the record." RAP 10.3(a)(6). Accordingly, we decline to review Zimmerman's argument that he was entitled to utilize the training manuals in presenting his defense.

Further, "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." ER 602. Personal knowledge means "facts [that a witness] has personally observed." State v. Vaughn, 101 Wn.2d 604, 611, 682 P.2d 878 (1984). The proponent of the testimony has the burden of introducing "evidence 'sufficient to support a finding' of personal knowledge." Vaughn, 101 Wn.2d at 611 (quoting ER 602). Accordingly, "testimony should be excluded . . . if, as a matter of law, no trier of fact could reasonably find that the witness had firsthand knowledge." Vaughn, 101 Wn.2d at 611-12 (citing 5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE § 219 (2d ed. 1982)).

B

Zimmerman contends that the trial court denied his right to present a defense by preventing him from calling Detective Sergeant Rodriguez as a witness. He asserts that, as a supervisor to the sting operation, Detective Sergeant Rodriguez would have had relevant information regarding his whereabouts prior to his arrest.

Zimmerman's offer of proof describing Detective Sergeant Rodriguez's proposed testimony consisted of (1) two police reports, one written by Detective Sergeant Rodriguez and one written for him by another officer; (2) a transcript of a pretrial interview of Detective Sergeant Rodriguez; and (3) an argument on the record.

The police reports do not indicate that Detective Sergeant Rodriguez had any personal knowledge of Zimmerman's whereabouts prior to his arrest. One

report merely certifies that no forensic evidence was submitted to the Vancouver Police Department, and the other states that Detective Sergeant Rodriguez reviewed a report on Zimmerman's cell phone.

The transcript of the pretrial interview with Detective Sergeant Rodriguez also does not indicate that he had any personal knowledge regarding Zimmerman's location prior to the arrest. When asked about specifics regarding the operation surrounding Zimmerman's arrest, Detective Sergeant Rodriguez frequently stated that he would have to refer to the police reports. For example:

[Counsel]: Are you aware that Mr. Zimmerman was arrested more than a mile away from this predetermined location?

[Rodriguez]: Ah, I would have to look at the other reports where he was arrested.

In short, Zimmerman does not point to—and Detective Sergeant Rodriguez did not make—any statement indicating that Detective Sergeant Rodriguez had any personal knowledge regarding Zimmerman's whereabouts prior to his arrest.

Moreover, Zimmerman fails to show how Detective Sergeant Rodriguez's testimony would have otherwise been relevant if he were allowed to be called as a witness. In an argument on the record, Zimmerman asserted that Detective Sergeant Rodriguez would have been able to testify about "the general way that the surveillance units are set up," "what, if any, records were taken or what reports were made," and "what might be available to corroborate the testimony of other officers."

The trial court appropriately found "that defense counsel's suggestion that [Detective Sergeant] Rodriguez knew 'who did what' . . . was not relevant . . . to

any issue at defendant's trial, particularly when others who already testified at the trial gave 'who did what' specifics." Indeed, evidence is relevant if it has "any tendency to make the existence of any fact *that is of consequence* to the determination of the action more probable or less probable." ER 401 (emphasis added). Zimmerman fails to show how, precisely, Detective Sergeant Rodriguez's testimony would have been of any consequence.

Notably, in its order limiting the testimony of Detective Sergeant Rodriguez, the trial court denied the State's motion to exclude Detective Sergeant Rodriguez as a witness. Instead, the trial court granted "the State's motion to limit testimony from Detective Sergeant Rodriguez and exclude the subjects proffered by defense counsel." In other words, Zimmerman was free to call Detective Sergeant Rodriguez as a witness if Zimmerman could establish that Detective Sergeant Rodriguez would have personal knowledge and that his testimony would be relevant.

Accordingly, the trial court did not err in denying Zimmerman's request to call Detective Sergeant Rodriguez as a witness.

C

Zimmerman also asserts that the trial court erred by refusing to allow Comte to testify as a sexual offender expert. Specifically, Zimmerman contends that Comte's testimony was necessary to remedy improperly-admitted testimony.

The improperly-admitted testimony alluded to by Zimmerman was the following statement by Detective Bickford, made during Zimmerman's cross-examination of him: "It is my belief, based upon the text messages, that Mr.

Zimmerman believed he was talking to a child." Zimmerman objected to the response and subsequently moved to strike Detective Bickford's answer.

Initially, the trial court overruled the objection. Consequently, Zimmerman sought to add Comte as an expert witness to rebut Detective Bickford's testimony. Upon reexamining the testimony and the objection, the trial court reversed course, stating that it should have sustained the objection. It then did so, instructing the jury to disregard Detective Bickford's statement. The trial court then ruled that Zimmerman could not call Comte as a witness, reasoning that doing so would create a "trial unto itself," be "confusing for the jury," "a waste of time," and "misleading."

Given these circumstances, the trial court did not err by precluding Comte from testifying. "[J]uries are presumed to follow the instructions provided." State v. Ervin, 158 Wn.2d 746, 756, 147 P.3d 567 (2006). Here, the trial court instructed the jury to disregard Detective Bickford's challenged statement. The trial court then properly applied ER 403 by ruling—given that the offending statement had been stricken—that Comte's testimony would create a "trial unto itself," be "confusing for the jury," "a waste of time," and "misleading." See ER 403. Because Detective Bickford's challenged testimony was stricken, there was no testimony to rebut. The trial court correctly reasoned that any evidentiary reply to stricken testimony would be nothing more than an unnecessary frolic in the midst of a long, involved trial.

Accordingly, the trial court did not err by refusing to allow Zimmerman to call Comte as an expert witness.

VI

Zimmerman lastly contends that the prosecutor engaged in misconduct by (1) misstating the law on attempt; (2) personally vouching for a witness, giving his personal opinion, and speaking in the first person; (3) misstating the reasonable doubt standard; and (4) misstating the law on communication with a minor for immoral purposes. We conclude that the prosecutor did not engage in misconduct in any of these respects.

A

"To prevail on a claim of prosecutorial misconduct, a defendant must show first that the prosecutor's comments were improper and second that the comments were prejudicial." State v. Warren, 165 Wn.2d 17, 26, 195 P.3d 940 (2008). While "[a] prosecutor may argue reasonable inferences from the evidence, [he or she] . . . may not make a 'clear and unmistakable' expression of personal opinion." Warren, 165 Wn.2d at 43 (internal quotation marks omitted) (quoting State v. Brett, 126 Wn.2d 136, 175, 892 P.3d 29 (1995)). Additionally, "[a] prosecuting attorney commits misconduct by misstating the law." State v. Allen, 182 Wn.2d 364, 373, 341 P.3d 268 (2015).

In determining whether a prosecutor's statements are prejudicial, "[t]he court evaluates the conduct in light of the total argument, issues, evidence, and jury instructions." Warren, 165 Wn.2d at 43. Further, prejudice is established if "there is a substantial likelihood the misconduct affected the jury's verdict." State v. Stenson, 132 Wn.2d 668, 718-19, 940 P.2d 1239 (1997). When a defendant objects or moves for mistrial on the basis of alleged prosecutorial misconduct,

deference is given to the trial court's ruling on the matter.  Stenson, 132 Wn.2d at 719.

B

Zimmerman asserts that the prosecutor engaged in misconduct by stating that a completed attempt crime cannot be abandoned.  Specifically, the prosecutor stated that "[t]he law does not allow, I changed my mind at the last minute if you've already taken the substantial step."  Contrary to Zimmerman's present contention, this was a correct statement of the law.  Indeed, it is well established that, "[o]nce a substantial step has been taken, and the crime of attempt is accomplished, the crime cannot be abandoned."  State v. Workman, 90 Wn.2d 443, 450, 584 P.2d 382 (1978).  Accordingly, the prosecutor did not misstate the law.

C

Zimmerman also asserts that the prosecutor engaged in misconduct by encouraging the jury to determine its own standards for what amounts to communication with a minor for immoral purposes.

From his opening brief, it is unclear what statements, exactly, Zimmerman contests.  However, the prosecutor explained the crime of communication with a minor for immoral purposes as follows:

> Now, you'll notice that the words 'immoral purpose' are not defined for you legally.  There are some phrases that have their common meaning.  So, you know, there was a Supreme Court case . . . that said pornography is, you'll know it when you see it.  That's the definition of pornography.  You know it when you see it.  In some respects, 'immoral purposes' are the same thing, not exactly, but— . . . .  A person commits the crime of communicating with a

minor with an immoral purpose if they communicate with someone they believe to be a minor for immoral purposes of a sexual nature.

Following a motion for a mistrial by Zimmerman, the trial court instructed the jury to follow its instructions if there was a conflict with a statement made by either attorney.

Standing alone, the prosecutor's statement likening "immoral purposes" to pornography may have been improper. However, the prosecutor then defined the offense using the same language as the trial court's instruction. Because the trial court's instruction was proper, the prosecutor did not misstate the law. See McNallie, 120 Wn.2d at 933 (upholding a jury instruction for communication with a minor for immoral purposes that defined "immoral purposes" as "immoral purposes of a sexual nature").

In any event, the trial court did not err by refusing to grant Zimmerman's motion for a mistrial. See Stenson, 132 Wn.2d at 719 (stating that where a defendant objects or moves for mistrial on the basis of alleged prosecutorial misconduct, deference is given to the trial court's ruling on the matter). The trial court instructed the jury to refer to the court's instructions on the law, and "juries are presumed to follow the instructions provided." Ervin, 158 Wn.2d at 756. Therefore, no trial court error is established.

D

Next, Zimmerman contends that the prosecutor engaged in misconduct by personally vouching for a witness, expressing his personal opinion, and speaking in the first person.[9]

Prior to closing argument, Zimmerman moved "[t]o prohibit the prosecutor from expressing any personal opinions as to the credibility of any witness or the guilt of the defendant." The trial court granted Zimmerman's motion.

At the start of his closing argument, the prosecutor stated that he would be using the word "I" instead of "the State" because "[i]t's just easier to speak in the first person." The prosecutor expressly stated that "nothing that you're going to hear . . . is my personal opinion." Then, throughout his closing argument, the prosecutor proceeded to speak in the first person.[10]

Notably, the prosecutor also commented on Zimmerman's credibility:

Defendant's [Craigslist] ad is sexual in nature. His response—the content about PDA, BDSM—by the way, you want a comment on his credibility? He doesn't know what BDSM means. He just put it in his advertisement response, he didn't know what it meant. Do you buy that? I can't stop you from it.

The prosecutor may have expressed his personal opinion by asking, "you want a comment on his credibility?" This remark suggests that the "comment on

---

[9] None of the prosecutor's statements indicate that he personally vouched for a witness during his closing argument or rebuttal, and Zimmerman's brief does not provide any example of this occurring. Accordingly, we decline to review whether the prosecutor personally vouched for a witness. See RAP 10.3(a)(6).

[10] The statements made by the prosecutor in the first person include: "I'm going to suggest to you now that the evidence shows that the defendant is guilty;" "I'm going to suggest to you that there are some conversations that individuals can have [depending on who is present];" and "I want you to believe . . . the Mr. Zimmerman who shows up in Exhibits 1, 2 and 3. That's the guy who I want you to believe because everything that he said wasn't motivated by his current desire to pull something over on the 12 of you."

[Zimmerman's] credibility" is the prosecutor's personal belief regarding Zimmerman's credibility, especially given that the prosecutor spoke in the first person throughout the entirety of his closing argument. However, it is so that the prosecutor prefaced his closing argument by stating that "nothing that you're going to hear . . . is my personal opinion." Therefore, when the closing argument is considered as a whole, the prosecutor's statements are not unfairly prejudicial. See Warren, 165 Wn.2d at 43 (stating that, when determining whether a prosecutor's conduct is prejudicial, "[t]he court evaluates the conduct in light of the total argument").

E

Zimmerman finally asserts that the prosecutor engaged in misconduct by trivializing the beyond a reasonable doubt standard and misstating the "abiding belief" principle.

A prosecutor acts improperly by "trivializ[ing] and . . . fail[ing] to convey the gravity of the State's burden and the jury's role in assessing its case against [a defendant]." State v. Anderson, 153 Wn. App. 417, 431, 220 P.3d 1273 (2009).

The United States Supreme Court has upheld the use of the term "abiding conviction" in a jury instruction, reasoning that '[t]he word 'abiding' . . . has the signification of settled and fixed, a conviction which may follow a careful examination and comparison of the whole evidence." Hopt v. People, 120 U.S. 430, 439, 7 S. Ct. 614, 30 L. Ed. 708 (1887). Additionally, the Court has described the beyond a reasonable doubt standard as "impressing upon the

factfinder the need to reach a subjective state of near certitude of the guilt of the accused." Jackson, 443 U.S. at 315.

Zimmerman first contends that the prosecutor trivialized the reasonable doubt standard by stating, "A reasonable doubt is one for which a reason exists." However, this statement mirrors the language of the trial court's jury instruction 2. Indeed, our Supreme Court has upheld a jury instruction containing this statement, reasoning that it "satisfied the minimum requirements of due process." State v. Bennett, 161 Wn.2d 303, 318, 165 P.3d 1241 (2007). Therefore, the prosecutor's statement was proper.

Next, Zimmerman asserts that the prosecutor improperly described "abiding belief" by equating it to doing the right thing. Zimmerman does not quote any particular language used by the prosecutor, but he appears to refer to this statement:

> What [abiding belief] means is, when you are released from the instruction the judge has given you about not talking to your friends and family about this case and when they ask you . . . [w]ell, did you reach the right decision? You bet we did.

The prosecutor's description of abiding belief can be read in two ways. First, it could be read as improperly stating that "abiding belief" means doing the morally right thing. Second, it could be read as properly stating that "abiding belief" means correctly applying the reasonable doubt standard.

In any event, the prosecutor's description of "abiding belief" was not prejudicial. Prejudice is determined "in light of the total argument, issues, evidence, and jury instructions." Warren, 165 Wn.2d at 43. Prior to making the statement quoted above, the prosecutor stated, "[I]t's been suggested to you

- 34 -

that . . . abiding belief is a lasting and enduring belief, and that's probably true." "Lasting and enduring belief" is a proper description of "abiding belief." See Hopt, 120 U.S. at 439 (stating that the word "abiding" is proper because it has the signification of "settled and fixed"). The prosecutor then made the statement quoted above, illustrating that an "abiding belief" is a lasting and enduring belief. Accordingly, the prosecutor's statements did not unfairly prejudice Zimmerman.

Affirmed.

Dwyer, J.

We concur:

Andrus, A.C.J.           Appelwick, J.